VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

FILED
CIVIL INTAKE

2021 JUL 28 AM 11:37

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

JONATHAN L. ARDEN,

ARDEN FORENSICS, PC

      Plaintiffs,

    -v-

NATIONAL ASSOCIATION OF MEDICAL EXAMINERS, INC.,
15444 Chinnereth Est.
Savannah, Missouri 64485

R/A: David P. Weiss, Esq.
600 Washington Avenue, 15th Floor
St. Louis, Missouri 63101

SALLY AIKEN
5211 E. Silver Spur Ln.
Spokane, WA 99217

JOHN SCOTT DENTON
2708 Piney Run
Bloomington, IL 61705

JAMES GILL
17 Otter Cove Dr.
Old Saybrook, CT 06475

GARY GOLDFOGEL
406 Bayside Road
Bellingham, WA 98225

KENT HARSHBARGER
9799 Dinwiddie Ct.
Dayton, OH 45458

Case No.:

**2021   10819**

AMY HAWES
3916 Dutch Valley Rd
Clinton, TN 37716

BRIAN PETERSON
S102W33325 County Road Lo
Mukwonago, WI 53149

KATHRYN HADEN-PINNERI
21827 Hollow Field Ln.
Katy, TX 77450

MARY ANN SENS
1155 Oxbow Ct.
Grand Forks, ND 58203

MARK SUPER
1476 Salmon Falls Rd.
El Dorado Hills, CA 95762

and

MARIUS TARAU
9707 W 145th Ter
Overland Park, KS 66221

                    Defendants.

## COMPLAINT

COMES NOW the plaintiffs, Jonathan L. Arden, MD and Arden Forensics, PC, by counsel

to seek judgment against the above-named defendants (together referred to as the "Defendants")

for the reasons set forth below:

## INTRODUCTION

1.     Jonathan L. Arden, MD, is a distinguished forensic pathologist who provides expert pathology and consulting services through his business, Arden Forensics, PC, to government entities, parties to disputes, and others throughout the country.

2.     According to its website, the National Association of Medical Examiners ("NAME") is a professional organization "founded in 1966 with the dual purposes of fostering the professional growth of physician death investigators and disseminating the professional and technical information vital to the continuing improvement of the medical investigation of violent, suspicious and unusual deaths."

3.     The individual defendants are also forensic pathologists and members of NAME. Many of the individual defendants are direct competitors to Dr. Arden in providing expert pathology and consulting services.

4.     The Defendants engaged in a lengthy campaign to destroy Dr. Arden's reputation and business by falsely claiming that he acted unethically when he participated in the authorship of a scientific peer-reviewed paper regarding potential bias in the field of forensic pathology decision-making. Rather than engage in a discussion of the merits of Dr. Arden's research and findings, the defendants defamed him and attempted to damage his business with false statements, set forth separately and as a part of an ethics complaint filed with NAME alleging that he acted unethically.

5.     In making these statements and in filing the ethics complaint, the Defendants candidly admitted that they believed Dr. Arden's research would damage their professional prospects. On numerous and repeated occasions, the Defendants were advised by Dr. Arden and

by each and every reviewing organization, that their claims about Dr. Arden were false. Knowing their falsity, the Defendants continued to make their false allegations recklessly and with malice.

## NATURE AND OVERVIEW OF THE CASE

6.    Dr. Arden co-authored an article entitled "Cognitive Bias in Forensic Pathology Decisions" ("Article") which was first published by the reputable Journal of Forensic Sciences ("JFS") on February 20, 2021. The Article explored to what extent irrelevant non-medical information, including the race of the decedent, can result in cognitive bias affecting forensic pathology decision-making. The ability to identify such biases is the essential first step which allows the implementation of countermeasures to improve the objectivity and accuracy of forensic science.

7.    One of the authors designed a study as part of the Article and received Institutional Review Board ("IRB") approval from the University of Alabama at Birmingham ("UAB").

8.    The authors conducted the IRB-approved study to determine if there was potential bias in manner of death determinations.

9.    The authors drafted the Article based in part on the study and submitted the Article for peer review. Following peer review, the Article was accepted for publication by the JFS.

10.    Defendants, alleging the article would damage their commercial interests and enhance the commercial prospects of Dr. Arden, engaged in a campaign to damage Dr. Arden's commercial prospects by falsely claiming that he and the authors acted unethically.

11.    Defendants knew, or with the exercise of due care would have known, that these statements were false.

12.    Specifically, the Defendants contacted the University College of London ("UCL,"), the employer of the first author of the paper, and JFS falsely stating that the authors acted

unethically. In the complaint filed with UCL, Defendants Gill, Sens and NAME stated falsely and without basis that the IRB-approved study was conducted "deceptively," constituted a "serious breach of editorial oversight," constituted "deviance," violated NAME By-Laws in the use of NAME-L (an email Listserv for NAME members), did not comport with IRB standards, breached surveyed respondents' confidentiality, that survey recipients were misled, that the finding of the Article branded NAME members as "biased by race," "disrespected" the surveyed subjects, was not conducted ethically, that the peer-reviewed Article was "embarrassing for science," and the study is "embarrassing for the authors."

13.    UCL and JFS investigated the Defendants' claims and advised them they were false. Nonetheless, Defendant Peterson filed an ethics complaint with the NAME Ethics Committee setting forth these same allegations of unethical conduct. Based on the allegations set forth in the complaint, the Ethics Committee—whose membership included a number of the individual Defendants—advised Dr. Arden that they intended to proceed with the complaint. Following weeks of delay, during which time the ethics complaint was leaked to many members of NAME and to the New York times, the Ethics Committee concluded that the ethics complaint was without merit and it was dismissed. Notwithstanding the determination of every professional reviewing body and their own association that these statements lacked merit, Defendants have continued to falsely assert that Dr. Arden acted unethically.

## PARTIES, JURISDICTION & VENUE

14.    Dr. Arden is an individual and resident of the Commonwealth of Virginia, Fairfax County.

15.    Defendant National Association of Medical Examiners, Inc. ("NAME") is a Missouri corporation with its headquarters in Savannah, Missouri.

16.     Upon information and belief, Defendant Sally Aiken, MD is an individual and resident of Washington.

17.     Upon information and belief, Defendant J. Scott Denton, MD is an individual and resident of Illinois.

18.     Upon information and belief, Defendant James Gill, MD is an individual and resident of Connecticut.

19.     Upon information and belief, Defendant Gary Goldfogel, MD is an individual and resident of Washington.

20.     Upon information and belief, Defendant Kent Harshbarger, JD, MD is an individual and resident of Ohio.

21.     Upon information and belief, Defendant Amy Hawes, MD is an individual and resident of Tennessee.

22.     Upon information and belief, Defendant Brian Peterson, MD is an individual and resident of Wisconsin.

23.     Upon information and belief, Defendant Kathy Haden-Pinneri, MD is an individual and resident of Texas.

24.     Upon information and belief, Defendant Mary Ann Sens, MD is an individual and resident of North Dakota.

25.     Upon information and belief, Defendant Mark Super, MD is an individual and resident of California.

26.     Upon information and belief, Defendant Marius Tarau, MD is an individual and resident of Kansas.

27.     The individual defendants are all NAME members.

28.     Defendants Goldfogel, Harshbarger, Hawes, Super and Tarau, at all relevant times were members of NAME's Ethics Committee ("Ethics Committee Defendants").

29.     Defendant Gill is and was at all relevant times NAME's President, defendant Sens is and was at all relevant times NAME's Executive Vice President, defendant Aiken is and was at all relevant times NAME's Chair of Board, defendant Haden-Pinneri is and was at all relevant times NAME's Vice-President, defendant Denton is and was at all relevant times NAME's Secretary-Treasurer, and defendant Harshbarger is and was at all relevant times a member of NAME's Executive Committee (collectively, the "Executive Committee Defendants").

30.     Defendants caused tortious injury by acts or omissions inside and outside of this Commonwealth, regularly do or solicit business in the Commonwealth, regularly engage in courses of conduct in the Commonwealth, derive substantial revenue from goods used or consumed or services rendered in the Commonwealth, and use a computer or computer network located in the Commonwealth.

31.     Defendants committed civil conspiracy under both the common law and Va. Code §§ 18.2-499 and 18.2-500. Co-conspirators are agents for each other. As such, the acts of any one co-conspirator are imputed to the others.

32.     Venue is proper in this circuit under Va. Code § 8.01-262 as a Dr. Arden resides in the jurisdiction and the cause of action, or any part thereof, arose in the jurisdiction.

### FACTS

33.     Dr. Arden was one of the authors who drafted the Article published in the JFS. Dr. Arden's role in the drafting of the Article was limited; his participation did not include or involve the creation, distribution, administration, or the statistical interpretation of the survey.

34.     The Article discusses the effect of cognitive bias on forensic decisions – an issue of critical importance to ensure the continued advancement of the profession and to confront and improve effects of bias in the field.

35.     The Article was approved by well-respected academic channels and subjected to rigorous oversight and review to ensure its appropriateness for publication.

36.     On February 1, 2019, a survey titled "Experiment on Cognitive Bias in Medical Examiner Cause and Manner of Death Determination in a Case Vignette Survey" was submitted to the University of Alabama at Birmingham ("UAB") Institutional Review Board ("IRB").

37.     On February 4, 2019, the IRB reviewed and approved the survey and issued terms of approval.

38.     On February 6, 2019, the IRB-approved survey was started and implemented pursuant to the IRB's terms of approval.

39.     The survey was sent directly to individually recruited participants. On no occasion was the study sent through the NAME-Listserv ("NAME-L"), which is an email distribution system set up, maintained and monitored by NAME.

40.     The research for the Article included an analysis by the University College of London ("UCL") of ten years' of death certificates from Nevada.

41.     The dataset of death certificates examined by UCL indicated that deaths due to head trauma were more likely to be ruled "homicide" rather than "accident" for deaths of Black children when compared to the deaths of White children.

42.     On November 26, 2020, the Article was submitted to JFS for approval and publication.

43.     The Article was subjected to peer review, and on February 11, 2021, JFS approved the article for publication.

44.     On February 20, 2021, JFS first published the Article.

45.     Rather than engage in an academic debate or discussion regarding the issues raised in the Article, Defendants orchestrated and implemented a coordinated series of attacks against Dr. Arden.

46.     Prior to launching these attacks, Defendants did not communicate their concerns directly to Dr. Arden nor did they make any effort to confirm his role in the authorship of the Article.

47.     Immediately after the Article was published, Defendants formed and expressed negative and unfounded opinions regarding and objections to the Article. Those opinions were expressed among Defendants, and other NAME members, on NAME-L.

48.     Defendants' objections to the Article were not grounded in science.

49.     On NAME-L, Defendant Peterson expressly stated that objective cause-of-death determinations are "basically nonsense" and asked "Is there anyone in our profession that has not, at one point of another, quipped about 'spinning the wheel of death' and picking one?"

50.     As the Defendants' statements were distributed and published via NAME-L, the other Defendants saw and were aware of these statements.

51.     Shortly after the Article was published, Defendants used NAME-L to recruit additional persons to engage in a coordinated series of attacks against Dr. Arden.

52.     Upon information and belief, Defendants texted, called, video-conferenced, e-mailed, and otherwise communicated with one another to coordinate attacks against Dr. Arden.

53.     Upon information and belief, Defendants texted, called, video-conferenced, e-mailed, and otherwise communicated with one another to recruit persons to join in their coordinated attacks against Dr. Arden.

54.     Upon information and belief, those opinions regarding the Article were expressed between Defendants, and other NAME members, on NAME-L through use of computers, phones, and other means of communication.

55.     Defendants attacked, defamed, and threatened Dr. Arden in these communications.

56.     These attacks were intended and designed to damage Dr. Arden, his business interests, reputation, trade, and his ability to participate in the field.

57.     In February 2021, certain Ethics Committee Defendants communicated and published negative and unfounded statements attacking Dr. Arden's competence and ethics. These attacks were published on NAME-L, by and between Defendants and third parties through use of computers, phones, and other means of communication.

58.     Publication of these attacks has caused, continues to cause, and will continue to cause material damage to Dr. Arden's business interests, trade and ability to participate in the field.

59.     In February 2021, Defendant Peterson communicated and published false, negative and unfounded statements attacking Dr. Arden's competence and ethics. These attacks were published on NAME-L, by and between Defendants and third parties through use of computers, phones, and other means of communication.

60.     These Defendants deliberately concealed essential facts from NAME members they were attempting to recruit.

61.     The remaining Defendants, despite having the requisite knowledge, responsibility, and positioning to do so, did not correct these flagrant, false statements made in public forums.

62.    In February or March 2021, Defendant Gill sent a letter on behalf of NAME to JFS demanding that the journal retract the Article.

63.    Defendants Haden-Pinneri, Aiken, and Denton co-signed this letter.

64.    This letter falsely and without basis stated that Dr. Arden unethically and deceptively conducted the study included in the Article.

65.    In February or March 2021, Defendant Peterson sent a separate letter to JFS demanding that the journal retract the Article.

66.    Defendants Denton, Gill, Goldfogel, Harshbarger, Hawes, Super, and Tarau co-signed this letter.

67.    This letter, penned by the same person who stated that objective cause of death determinations are "basically nonsense," falsely and without basis reiterated the pre-textual grounds stated, and ultimately fully rejected, in the Ethics Complaint (defined later).

68.    JFS – an independent and respected journal – stood by its peer review process and has rejected these Defendants' conclusions and calls for retraction.

69.    Upon information and belief, Defendants continue to submit calls for retraction to JFS, coordinate and combine on further efforts, and continue to recruit others to do so while intentionally providing them false and ungrounded information to incentivize them to do so.

70.    In February 2021 and after Executive Committee Defendants and Ethics Committee Defendants communicated and published the above negative, unfounded statements regarding Dr. Arden, Defendant Peterson submitted an ethics complaint against Dr. Arden to NAME ("Ethics Complaint").

71.    The Ethics Complaint alleged two pre-textual grounds: (1) that the Article "by basically accusing[ed] every member of 'unconscious' racism, a charge impossible to either prove

or refute, members will henceforth need to confront this bogus issue whenever testifying in court;" and (2) that the study used in the Article was conducted through NAME-L in violation of NAME By-Laws. Neither of these grounds is well founded.

72. The Ethics Complaint was presented to the Ethics Committee Defendants for review and consideration.

73. Per Article IV, Section 4 of NAME's By-Laws, "The Ethics Committee shall review and make recommendations to the Executive Committee on all questions of unethical practice in accordance with the procedures detailed in Article X of these By-Laws."

74. The Ethics Complaint was, at all relevant times, within the purview and control of the Ethics Committee Defendants.

75. The Ethics Complaint was, at all relevant times, within the purview and control of the Executive Committee Defendants.

76. In reviewing and processing the Ethics Complaint, the Ethics Committee Defendants combined, associated, agreed, and acted, both in their individual and joint capacities, to damage Dr. Arden's reputation, ethics, business interests, trade and ability to participate in the field.

77. The conduct and statements of the Executive Committee Defendants and Ethics Committee Defendants evidence that they had pre-judged the allegations set forth in the Ethics Complaint in a manner adverse to Dr. Arden's interests.

78. The pre-judgment of the allegations set forth in the Ethics Complaint were intended to and had the effect of damaging Dr. Arden's reputation, business interests, trade and ability to participate in the field.

79.     The conduct, statements, and consideration of published statements falsely defaming and attacking Dr. Arden prior to the filing of the Ethics Complaint of the Executive Committee Defendants and Ethics Committee Defendants evidence a bias and conflict of interest that should have caused them to recuse.

80.     The failure to recuse and the conduct that followed had the effect of damaging Dr. Arden's reputation, business interests, trade and ability to participate in the field.

81.     The remaining Defendants, despite having the requisite knowledge, responsibility, and positioning to do so, did not correct these flagrant, false statements made in public forums.

82.     Upon information and belief, Defendants have recruited additional individuals to submit additional calls for retraction to JFS and provided them with false, inaccurate, and incomplete information to incentivize them to do so.

83.     JFS – an independent and respected journal – stood by its peer review process and has rejected these Defendants' conclusions and calls for retraction.

84.     Upon information and belief, Defendants continue to submit calls for retraction to JFS, coordinate and combine on further efforts, and continue to recruit others to do so while intentionally providing them false and ungrounded information to incentivize them to do so.

85.     On March 8, 2021, in a separate line of attack, Defendants Gill and Sens sent a complaint to UCL on NAME letterhead and on behalf of NAME.

86.     In this complaint, Defendants Gill and NAME stated falsely and without basis that the IRB approved study was conducted "deceptively," constituted a "serious breach of editorial oversight," constituted "deviance," violated NAME By-Laws in the use of NAME-L, did not comport with IRB standards, breached surveyed respondents' confidentiality, that survey recipient were misled, that the finding of the Article branded NAME members as "biased by race,"

"disrespected" the surveyed subjects, was not conducted ethically, that the peer-reviewed Article was "embarrassing for science," and the study is "embarrassing for the authors."

87.    These allegations were baseless, false, and Defendants Gill and NAME knew they were baseless and false.

88.    On March 26, 2021, UCL dismissed the allegations, found the grounds contained in the complaint were "mistaken," closed the matter off, and did not agree with the request that the Article be retracted.

89.    These unfounded attacks were orchestrated and carried out by members of the NAME Ethics and Executive committees prior to and at the same time that members of the Ethics committee and Executive committee coordinated and advanced the Ethics Complaint filed by Defendant Peterson.

90.    Ultimately, the independent entities – JFS and UCL - that received Defendants' external institutional attacks rejected those attempts and found them baseless.

91.    On March 17, 2021, the Ethics Committee Defendants met virtually and decided to advance the Ethics Complaint. This decision had the intended effect of legitimizing the attacks on Dr. Arden.

92.    Upon information and belief, the March 17, 2021 meeting between Ethics Committee Defendants occurred over Zoom, or another videoconferencing service. The videoconferencing service accessed and utilized one or more computers and/or networks located in the Commonwealth of Virginia.

93.    This videoconference was called and was part of a plan and a scheme that was designed to target a Virginia resident with an intent to cause  harm to a resident of Virginia and that the intended effects of their action would be felt in Virginia.

94.     On March 19, 2021, the Ethics Committee Defendants submitted a letter to Dr. Arden stating that the allegations in the Ethics complaint "may, in fact, be well founded" and that the Ethics Committee Defendants intended to further investigate the claims. The issuance of this letter gave the Ethics complaint the imprimatur of legitimacy.

95.     At the time that these allegations were made, the Ethics Committee Defendants either knew them to be false or would have known them to be false had they undertaken reasonable due diligence.

96.     Under applicable NAME By-Laws, ethics complaints are to be confidential. The purpose of the confidentiality requirement is to avoid damage to the reputation of the subject of the ethics complaint in the event that the allegations are not substantiated.

97.     On information and belief, the Ethics Committee Defendants were aware of this confidentiality requirement when they sent the letter to Dr. Arden. Despite their knowledge, the Ethics Complaint was leaked, and its contents published, in the New York Times on April 16, 2021.

98.     The New York Times article included the representation that "the accused doctors declined to discuss [the Ethics Complaint] or did not respond to a request for comment."

99.     Defendants leaked the Ethics Complaint, caused the Ethics Complaint to be leaked, allowed the Ethics Complaint to be leaked, or failed to adequately protect the contents of the Ethics Complaint and prevent it from being leaked, despite their responsibility to do so.

100.    Causing or allowing publication of the Ethics Complaint was intended to damage Dr. Arden's reputation, business interests, trade and ability to participate in the field.

101.    The Ethics Complaint, and its contents, were published nationally and internationally in other publications as well.

102. In an effort to mitigate his damages, Dr. Arden retained counsel, incurring the expense to do so out of pocket. By letter dated April 19, 2021, Dr. Arden, through counsel, contested the allegations set forth in the Ethics Complaint and demanded that it be dismissed by the Ethics Committee.

103. Notwithstanding Dr. Arden's letter and the clear statements therein that the pendency of the Ethics Complaint was having immediate and material negative impacts in his business and his reputation, and demands that remedial action be taken immediately, NAME failed and refused to respond in a timely or a substantive manner. The complaint was knowingly allowed to linger along with the negative effects.

104. On April 29, 2021, NAME's counsel advised counsel to Dr. Arden that—at the March 17, 2021 virtual meeting when deciding to proceed with the Ethics Complaint—neither NAME, the Ethics Committee Defendants, nor the Executive Committee Defendants gave any credence to the allegation that the Article "by basically accusing every member of 'unconscious' racism, a charge impossible to either prove or refute, members will henceforth need to confront this bogus issue whenever testifying in court."

105. The Ethics Committee Defendant's March 19, 2021 letter, which has been widely distributed among the members of NAME and publicly, including to the New York Times, did not reveal that NAME, the Ethics Committee Defendants, nor the Executive Committee Defendants gave any credence to the allegation that the Article "basically accus[ed] each member of 'unconscious' racism."

106. Given the rejection by NAME, the Ethics Committee Defendants, and the Executive Committee Defendants of the allegation that the Article "basically accus[ed] each

member of 'unconscious' racism," the decision to preliminarily proceed with the Ethics Complaint was apparently based solely on the allegation that the authors used NAME-L to conduct a survey.

107. As all Defendants knew, or had reasonable opportunity to know, at the time that the letter to Dr. Arden was issued—*inter alia* because they have access to, received and monitored, NAME-L communications, no survey was conducted through NAME-L.

108. In any event, even if the survey had been conducted through NAME-L, at the time that the letter was issued, the Defendants knew or should have known that the prohibition against submitting a survey through NAME-L had yet to be adopted when the IRB-approved survey took place.

109. All Defendants also knew, or had reasonable opportunity to know, at the time that the letter to Dr. Arden was issued that the study had been approved by the IRB and was subjected to peer review prior to publication.

110. As Defendants knew that the survey was not distributed through NAME-L and that the rule establishing the prohibition had yet to be enacted, they also knew that this second alleged grounds for the Ethics Complaint was pretextual and devoid of merit.

111. In conceiving, drafting, submitting and publishing communications regarding the existence and contents of the Ethics Complaint, as well as in recruiting other NAME members to their campaign attacking Dr. Arden, Defendants Peterson, Gill, and Denton used NAME-L, and other means of communication, to falsely and without basis assert that Dr. Arden had acted unethically in the publication of the Article.

112. These defendants made false statements to and deliberately concealed essential facts from NAME members they were attempting to recruit.

113. In agreeing to pursue the Ethics Complaint in the full knowledge that it was without basis, Defendants combined their efforts, associated, agreed, mutually undertook concerted action to advance an attack on Dr. Arden's reputation, ethics, business interests, trade and ability to participate in the field.

114. Following the involvement and expense of retaining counsel, NAME, the Executive Committee Defendants and Ethics Committee Defendants conceded the Ethics Complaint, and their decision to advance and provide legitimacy to it, was wrong, without basis, and unfounded.

115. On May 13, 2021, the Ethics Committee Defendants issued a second letter to Dr. Arden that stating that the Ethics Complaint was "not well-founded, a hearing is not warranted, and the case file has been closed." The letter alleged that the Ethics Committee's reversal of position was based on "explanation and details" which were "provid[ed], through your legal counsel" and which were "to varying degrees, prior to your response, unknown to the Ethics Committee."

116. Despite knowledge of the falsity of their prior attempts and the fact that every reviewing organization had rejected them as wholly without foundation, the Defendants making the above-referenced statements have made no efforts to retract, correct, or otherwise ameliorate the damaging effects of those statements.

## COUNT I – STATUTORY CONSPIRACY PURSUANT TO VA. CODE §§ 18.2-499 and 18.2-500

117. Plaintiffs incorporate all prior and subsequent allegations as if fully laid out herein.

118. Section 18.2-499 of the Code of Virginia—Combinations to injure others in their reputation, trade, business or profession; rights of employees—provides as follows:

A. Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500 18.2-500.

B. Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A of this section shall be guilty of a violation of this section and subject to the same penalties set out in subsection A.

119.     Defendants combined, associated, agreed, mutually undertook or concerted to willfully and maliciously injure Plaintiffs in their reputation, business, trade and profession.

120.     Defendants orchestrated and understood they were acting in concert to damage Plaintiffs in their reputation, business, trade, and profession.

121.     Defendants willfully and maliciously compelled others to perform acts in furtherance of collective efforts to injure Plaintiffs in their reputation, business, trade and profession.

122.     In furtherance of their combined actions, Defendants published false statements constituting defamation and defamation per se, breached their fiduciary duties to Plaintiffs, and tortiously interfered with Plaintiffs' contractual relations and/or business expectancy.

123.     Plaintiffs have suffered damages and will suffer future damage to his reputation, business, trade, and profession.

124.     Plaintiffs have suffered damages and will suffer damages including financial loss, shame, humiliation, embarrassment, indignity, and mental suffering.

125. Section 18.2-500 of the Code of Virginia—Same; civil relief; damages and counsel fees; injunctions—provides for the following civil remedies for the violation of Section 18.2-499 of the Code:

> A. Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, "damages" shall include loss of profits.

126. Plaintiffs request, and are entitled to, recovery of three-fold damages pursuant to Va. Code § 18.2-500(A).

127. Defendants acted with actual malice, or willful and wanton disregard of the Plaintiffs' rights, allowing the imposition of punitive damages.

128. Plaintiffs request, and are entitled to, recovery of attorneys' fees and costs of this suit pursuant to Va. Code § 18.2-500(A).

### COUNT II – COMMON LAW CONSPIRACY

129. Plaintiffs incorporate all prior and subsequent allegations as if fully laid out herein.

130. Defendants combined, to accomplish by concerted action, unlawful or criminal purposes or lawful purposes by criminal or unlawful means which resulted in damage to Plaintiffs as a result of the Defendants' actions committed in furtherance of the conspiracy.

131. In furtherance of their concerted actions, Defendants published false statements constituting defamation and defamation per se, breached their fiduciary duties to Plaintiffs, and tortiously interfered with Plaintiffs' contractual relations and/or business expectancy.

132. Plaintiffs have suffered damages and will suffer future damage to his reputation, business, trade, and profession.

133.     Plaintiffs have suffered damages and will suffer damages including financial loss, shame, humiliation, embarrassment, indignity, and mental suffering.

134.     Defendants acted with actual malice, or willful and wanton disregard of the plaintiffs' rights, allowing the imposition of punitive damages.

### COUNT III - DEFAMATION

135.     Plaintiffs incorporate all prior and subsequent allegations as if fully laid out herein.

136.     Defendants published to third parties false and defamatory statements concerning Plaintiffs.

137.     Defendants knew were false or acted with reckless disregard as to whether such statements were true.

138.     Defendants acted negligently or lacked a reasonable, objective basis for believing such statements were true.

139.     Plaintiffs are not public figures.

140.     Defendants' false statements concerning Plaintiffs constitute defamation per se as the statements impute unfitness to perform or discharge the duties of Plaintiffs' employment and prejudice Plaintiffs in their trade and profession.

141.     Plaintiffs have suffered damages and will suffer damages including financial loss, shame, humiliation, embarrassment, indignity, and mental suffering.

142.     Defendants' conduct supports the imposition of punitive damages for either defamation per se or the making of such statements with actual malice or a lack of an objective basis.

### COUNT IV – BREACH OF FIDUCIARY DUTY

143.     Plaintiffs incorporate all prior and subsequent allegations as if fully laid out herein.

144.    NAME was founded to foster professional growth of its members and disseminate professional and technical information vital to the improvement of the profession.

145.    In their roles as the managers of the association, specifically including without limitation their role in reviewing ethics complaints, NAME, the Executive Committee Defendants, and the Ethics Committee Defendants had a fiduciary duty to Dr. Arden.

146.    NAME, the Executive Committee Defendants, and the Ethics Committee Defendants not only abdicated and breached this duty, but instead weaponized every tool at its disposal to inflict maximum damage on Dr. Arden's professional interests and to suppress dissemination of vital information for the community and profession at large.

147.    As a result, Dr. Arden has suffered damages and will suffer damages including financial loss, shame, humiliation, embarrassment, indignity, and mental suffering.

148.    NAME, the Executive Committee Defendants, and the Ethics Committee Defendants acted with malice and wantonness which supports the imposition of punitive damages.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS OR BUSINESS EXPECTANCY

149.    Plaintiffs incorporate all prior allegations as if laid out fully herein.

150.    In their ordinary business, Plaintiffs have valid contractual relationships and/or a business expectancy of such future relationships.

151.    Defendants orchestrated their campaigns against Plaintiffs with knowledge of these relationships.

152.    Defendants intentionally targeted their efforts to interfere with and cause breaches in Plaintiffs' contractual relationships as well as a loss of future business expectancy.

153.    Defendants used improper means to interfere with Plaintiffs' contractual relationships and business expectancy. In addition to the above-stated allegations, these improper

means include misrepresentation, deceit, defamation, misuse of inside or confidential information, breach of a fiduciary relationship, statutory conspiracy to damage Plaintiffs' interests, and common law conspiracy to damage Plaintiffs' interests.

154. Defendants compete directly with Plaintiffs to obtain business and business expectancies.

155. Plaintiffs suffered damages and will suffer damages including financial loss, shame, humiliation, embarrassment, indignity, and mental suffering.

156. Defendant's actions were intentional, committed with malice, or committed with wantonness. As such, the imposition of punitive damages is warranted.

**WHEREFORE**, Plaintiffs respectfully request the Court enter an award in their favor, against Defendants, for: (1) compensatory damages of $5,000,000.00; (2) trebling of any damages awarded pursuant to Va. Code §§ 18.2-499 and 18.2-500; (3) punitive damages in the amount of $3,000,000.00; (4) reasonable attorney's fees and costs of suit; and (5) any other relief the Court deems appropriate.

TRIAL BY JURY IS DEMANDED.

Dated: July 27, 2021                      Respectfully submitted,

*/s/ John E. Komisin*
John E. Komisin (VSB No. 84061)
Troutman Pepper Hamilton Sanders, LLP
1001 Haxall Point (23219)
P.O. Box 1122
Richmond, Virginia 23218-1122
Tel: 804-697-1872
Fax: 804-697-1339
Email: jed.komisin@troutman.com

*Counsel for Plaintiffs*

117751268