IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JONATHAN L. ARDEN, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:21-cv-991 (AJT/IDD) |
| ) | |
| NATIONAL ASSOCIATION OF ) | |
| MEDICAL EXAMINERS, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## ORDER

Plaintiffs have filed an action for a variety of business torts, including business defamation, business conspiracy, breach of fiduciary duty and interference with prospective advantage. Defendants National Association of Medical Examiners, Inc. ("NAME"), Sally Aiken, John Scott Denton, James Gill, Gary Goldfogel, Kent Harshbarger, Amy Hawes, Kathryn Haden-Pinneri, Mary Ann Sens, Mark Super and Marius Tarau (collectively, the "NAME Defendants") and also Defendant Dr. Brian Peterson have filed motions to dismiss based on lack of personal jurisdiction [Doc. Nos. 7, 10] (together, the "Motions to Dismiss"). Upon consideration of the Motions to Dismiss, the memoranda in support thereof and in opposition thereto, the arguments of counsel presented at the hearing held on October 20, 2021, and for the reasons that follow, Defendants' Motions to Dismiss are GRANTED for lack of personal jurisdiction;[1] and this action is DISMISSED without prejudice.

---

[1] In their Motion to Dismiss [Doc. No. 7], the NAME Defendants also seek dismissal for failure to state a claim and that portion of the Motion is DENIED as moot.

## I.  BACKGROUND

The following facts are taken from the Complaint unless otherwise stated. [Doc. No. 1-1] ("Compl.").

Plaintiff Arden is a forensic pathologist who provides pathology and consulting services through his business, Plaintiff Arden Forensics, PC.[2]  Compl. ¶ 1.  Defendant NAME is a Missouri professional organization located in Missouri, formed with the purposes of "fostering the professional growth of physician death investigators and disseminating the professional and technical information vital to the continuing improvement of the medical investigation of violent, suspicious and unusual deaths." *Id.* ¶ 2.  The individual Defendants are forensic pathologists and members of NAME, and many are Arden's professional competitors. *Id.* ¶ 3.

On February 4, 2021, the Journal of Forensic Sciences ("JFS") published a peer reviewed article entitled "Cognitive Bias in Forensic Pathology Decisions" co-authored by Arden, which explored to what extent irrelevant non-medical information, including a decedent's race, can result in cognitive bias affecting forensic pathology decision-making ("the Article"). *Id.* ¶¶ 6, 43, 44. The Article was partly based on a study that one of the authors had designed in order to determine if there was potential bias in death determinations, and for which the author had received Institutional Review Board ("IRB") approval on February 4, 2019. *Id.* ¶¶ 7–9, 27.  That study was started on February 6, 2019, when a survey was sent directly to individually recruited participants. *Id.* ¶ 39.  It was not sent through the NAME listserv, which is an email distribution system set up, maintained, and monitored by NAME. *Id.*  The research for the Article also

---

[2] The Complaint does not allege that Plaintiff Arden is a member of NAME. However, Exhibit C to Plaintiff's Opposition indicates that Plaintiff Jonathan Arden is a member of NAME. *See* [Doc. No. 27-3] at 4. Defendants do not contest that Plaintiff is a member.

included a University College of London ("UCL") analysis of ten years of death certificates from Nevada, which indicated that deaths due to head trauma were more likely to be ruled "homicide" rather than "accident" for the deaths of Black children when compared to the deaths of White children. *Id.* ¶ 41.

After the Article was published, Defendants distributed and published through the NAME listserv negative opinions about the Article. *Id.* ¶¶ 47, 48, 50. In that regard, Plaintiffs claim that Defendants' criticisms were not founded in science and they communicated with each other to coordinate their credibility attacks against Arden and to recruit others to join in their efforts to damage Arden, his business interests, reputation, trade, and ability to participate in the field. *Id.* ¶¶ 52–53, 56.

In February 2021, the Ethics Committee Defendants[3] and, separately, Defendant Peterson communicated and published negative and unfounded statements on the NAME listserv attacking Arden's competence and ethics. *Id.* ¶ 57. Plaintiffs allege the publication of these attacks has caused, continues to cause, and will continue to cause material damage to Arden's business interests, trade, and ability to participate in the field. *Id.* ¶¶ 58, 59. According to the Complaint, the "Ethics Complaint was, at all relevant times, within the purview and control of the Executive Committee Defendants;"[4] and the Defendants other than Peterson "did not correct these flagrant, false statements made in public forums." *Id.* ¶ 61.

---

[3] The following Defendants are referred to in the Complaint as "the Ethics Committee Defendants": Kent Harshbarger, Gary Goldfogel, Amy Hawes, Mark Super and Marius Tarau. Compl. ¶ 28.
[4] The following Defendants are referred to in the Complaint as "the Executive Committee Defendants": Defendants Sally Aiken, NAME's Board Chair, Kent Harshbarger, Executive Committee Member, James Gill, NAME's President, Mary Ann Sens, NAME's Executive Vice President, Kathryn Haden-Pinneri, NAME's Vice-President, and John Scott Denton, NAME's Secretary-Treasurer. Compl. ¶ 29.

In February or March 2021, Defendant Gill sent a letter to JFS on behalf of NAME—co-signed by Defendants Haden-Pinneri, Aiken, and Denton—demanding that JFS retract the Article, stating Arden had unethically and deceptively conducted the study included in the Article. *Id.* ¶¶ 62–64. In February or March 2021, Defendant Peterson sent a separate letter to JFS—co-signed by Defendants Denton, Gill, Goldfogel, Harshbarger, Hawes, Super, and Tarau—demanding that the journal retract the Article. *Id.* ¶¶ 65, 66. JFS did not retract the Article. *Id.* ¶ 68.

In February 2021, Defendant Peterson submitted to NAME an ethics complaint against Arden (the "Ethics Complaint"), alleging that the Article accused every NAME member of unconscious racism, such that members would need to confront the issue whenever testifying in court, and that the study used in the Article was conducted through the NAME listserv in violation of NAME bylaws. *Id.* ¶ 71. The Ethics Complaint was subsequently leaked to the New York Times and its contents published by the New York Times on April 16, 2021, and also by other publications nationally and internationally. *Id.* ¶¶ 97, 101.

On March 17, 2021, the Ethics Committee Defendants met virtually through a videoconferencing service in connection with the Ethics Complaint and decided to advance the Ethics Complaint for further consideration. *Id.* ¶ 91. By letter dated March 19, 2021, Arden was informed of this decision and that the allegations in the Ethics Complaint "may, in fact, be well founded," which gave the Ethics Complaint "the imprimatur of legitimacy."[5] *Id.* ¶¶ 91, 94, 96, 97, 99. On May 13, 2021, the Ethics Committee Defendants issued a second letter to

---

[5] The Complaint alleges that the March 17 meeting used a videoconferencing service that accessed and utilized one or more computers and/or networks located in Virginia and was part of a plan and scheme that was designed to target a Virginia resident, with intent to cause harm to said resident and that the intended effects of the action would be felt in Virginia. Compl. ¶¶ 92–93.

4

Arden that the Ethics Committee had concluded that the Ethics Complaint was meritless and dismissed the case, citing as the basis for its decision explanations and details that were "provid[ed] through your legal counsel" and which were "to varying degrees, prior to your response, unknown to the Ethics Committee." *Id.* ¶ 115.[6]

A separate ethics complaint on NAME letterhead and on behalf of NAME was filed by Defendants Gill and Sens on March 8, 2021 with the University College of London ("UCL"), which employed one of the article's authors. This ethics complaint "stated falsely . . . that the IRB-approved study was conducted 'deceptively,' constituted a 'serious breach of editorial oversight,' constituted 'deviance,' violated NAME bylaws" by using the email listserv for NAME members, "did not comport with IRB standards, breached surveyed respondents' confidentiality, that survey recipient[s] were misled, that the finding of the Article branded NAME members as 'biased by race,' 'disrespected' the surveyed subjects, was not conducted ethically," was "embarrassing for science," and was "embarrassing for the authors." *Id.* ¶¶ 85–86. On March 26, 2021, UCL dismissed the allegations and did not retract the article. *Id.* ¶ 88.

Plaintiffs bring claims of: (1) statutory conspiracy pursuant to Va. Code §§ 18.2-499 and 18.2-500 (Count I); (2) common law conspiracy (Count II); (3) defamation (Count III); (4) breach of fiduciary duty (Count IV); and (5) tortious interference with contractual relations or business expectancy (Count V).[7] Briefly summarized, Plaintiffs allege in support of their claims that when Defendants made their attacks on the Article, they either knew them to be false or

---

[6] On April 19, Arden, through counsel, wrote to NAME contesting the allegations in the Ethics Complaint and demanding that the Ethics Committee dismiss it. Compl. ¶ 102.

[7] Plaintiffs seek: (1) compensatory damages of $5,000,000; (2) treble damages pursuant to Va. Code §§ 18.2-499 and 18.2-500; (3) punitive damages of $3,000,000; (4) reasonable attorney's fees and costs; and (5) any other relief the Court deems appropriate.

5

would have known them to be false had they undertaken reasonable due diligence. *Id.* ¶ 95. More specifically, Defendants knew, or should have known, by March 19, that no survey had been conducted through the NAME listserv because Defendants had access to listserv communications and that, even if the survey had been submitted through the NAME listserv, there was no prohibition against doing so. *Id.* ¶¶ 107–108. Overall, Defendants knew that the alleged basis for the Ethics Complaint was pretextual and meritless and the statements made by the Defendants on the NAME listserv public forums were false. *Id.* ¶ 81. Nevertheless, Defendants agreed and mutually undertook concerted action to advance an attack on Arden professionally. *Id.* ¶¶ 110, 113.[8]

## II. ANALYSIS

Plaintiff Arden is a resident of Fairfax County, Virginia. *Id.* ¶ 14. Defendant NAME is a Missouri corporation with its principal place of business in Missouri. *Id.* ¶ 15. Each of the individual Defendants is a citizen of a state other than Virginia. *Id.* ¶¶ 16–27. Accordingly, Plaintiffs assert jurisdiction over only non-resident Defendants, all of whom have submitted sworn declarations that generally deny that they reside or have any assets, offices, or employees in Virginia. *See* [Doc. Nos. 8-5–15].

---

[8] *See also* Compl. ¶¶ 76, 77 (alleging that, in reviewing and processing the Ethics Complaint, the Ethics Committee Defendants pre-judged the allegations in the Ethics Complaint in a way that adversely affected Arden's interests, and combined, associated, agreed, and acted, in their individual and joint capacities, to damage Arden's reputation, ethics, business interests, trade, and ability to participate in the field); *id.* ¶¶ 79, 80 (alleging that, because the Ethics Committee Defendants were biased against Arden, they should have recused themselves from the review of the Ethics Complaint and their failure to do so damaged Arden's reputation, business interests, trade and ability to participate in the field.); *id.* ¶¶ 104-106 (alleging that, although Defendants admitted to Arden's counsel that none of them gave any credence to the allegation that the article "basically accus[ed] each member of 'unconscious' racism," the Ethics Committee's March 19 letter, published in the New York Times and elsewhere, did not reveal that the Defendants did not give credence to that allegation and Defendants knew that the Ethics Complaint was proceeding based on the false allegation that the authors used the NAME listserv to conduct the survey).

Plaintiff bears the burden of demonstrating personal jurisdiction by a preponderance of the evidence once its existence is challenged by the defendant. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Jones v. Frazier*, No. 1:09-cv-513, 2009 WL 2601355, at *3 (E.D. Va. Aug. 18, 2009). In that regard, when the district court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff only needs to prove a *prima facie* case of personal jurisdiction. *Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) (citing *Combs*, 886 F.2d at 676). And in deciding whether plaintiff has proved a *prima facie* case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof and resolve all factual disputes in the plaintiff's favor. *Id.* However, the district court is not required to look solely at the plaintiff's allegations or proof, but may consider all documents submitted in connection with the motion, including "the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) ("[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge.") (citing *Combs,* 886 F.2d at 676); *see also Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 979 (N.D. Cal. 2016) (citing *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)) (stating in deciding whether a *prima facie* showing has been made, the court accepts as true the uncontroverted allegations in the complaint and conflicts between facts contained in the parties' affidavits must be resolved in a plaintiff's favor). The court may also consider and accept as true "a document submitted by the movant that was not attached to or

expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

As a general proposition, in order to exercise either general or specific personal jurisdiction over a defendant, a defendant must have "purposefully established minimum contacts in the forum State," such that "[it] should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *see also Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (stating a court may exercise personal jurisdiction over a nonresident defendant so long as the defendant has certain minimum contacts with the forum and the suit does not offend "traditional notions of fair play and substantial justice").

What constitutes constitutionally sufficient "minimum contacts" depends on the type of personal jurisdiction being asserted. For the purposes of satisfying the constitutional due process requirements for the exercise of general jurisdiction over a defendant foreign corporation/non-resident individual, that defendant must engage in "continuous and systematic general business contacts" with the forum State, *Witt v. Reynolds Metals Co.*, 240 Va. 452, 454-455 (1990) (citing *International Shoe Company v. Washington*, 326 U.S. 310, 318 (1945)), such that the defendant is "essentially at home in the forum State," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Plaintiffs concede that there is no general jurisdiction over any Defendant.[9] The Court will therefore consider whether the Court may exercise specific personal jurisdiction over any Defendant.

When a federal court's subject matter jurisdiction rests on diversity of citizenship, as it does here, the court has specific personal jurisdiction over a non-resident defendant if an applicable state long arm statute confers jurisdiction. However, the reach of Virginia's long arm statute is coextensive with the reach of the Due Process Clause of the United States Constitution and the assertion of that jurisdiction must be consistent with constitutional due process. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). For that reason, the "statutory inquiry merges with [the] constitutional examination." *Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.*, 218 Va. 533, 534 (1977) ("The purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over nonresidents who engage in some purposeful activity in Virginia."). That "constitutional examination" is not "mechanical." *Burger King*, 471 U.S. at 478. Rather, a court must weigh "the totality of the facts before [it]," *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 561 (4th Cir. 2014), and determine whether (1) the defendants "purposefully availed [themselves] of the privilege of conducting activities" in Virginia; (2) "the plaintiffs' claims [arose] out of those activities directed at" Virginia; and (3) "the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d

---

[9] General jurisdiction exists whenever a foreign corporation/individual engages in "continuous and systematic general business contacts" with the forum State, *Witt v. Reynolds Metals Co.*, 240 Va. 452, 454-455 (1990) (citing *International Shoe Company v. Washington*, 326 U.S. 310, 318 (1945)), such that the defendant is "essentially at home in the forum State, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cited in *Daimler A.G. v. Bauman*, 571 U.S. 117, 127 (2014)).

185, 189 (4th Cir. 2016) (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712-13 (4th Cir. 2002)).  In a case involving Internet contacts, a sliding scale test determines whether a "defendant purposefully availed itself of the privilege of conducting activities in the State;" and based on that sliding scale, a court may exercise jurisdiction over an out-of-state defendant when that defendant "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that the activity creates, in a person within the State, a potential cause of action." *ALS Scan, Inc.*, 293 F.3d at 714.

With respect to the first prong of the constitutional analysis, whether a defendant has purposefully availed itself of the privilege of conducting activities in a state, a court will consider numerous non-exclusive factors, including whether the defendant maintains offices or agents in the forum state, owns property in the forum state, reached into the forum state to solicit or initiate business, deliberately engaged in significant long-term business activities in the forum state or made in-person contact with the resident of the forum in the forum state regarding the business relationship.  A court will also consider "whether the parties contractually agreed that the law of the forum state would govern disputes, whether the performance of contractual duties was to occur within the forum and "the nature, quality and extent of the parties' communications about the business being transacted." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

Because Plaintiff has identified a potentially applicable provision of the long-arm statute, the Court will consider whether the Plaintiffs have established a *prima facie* case for specific personal jurisdiction over any defendant that passes constitutional muster.

10

Plaintiffs have presented no evidence that the any of the Defendants reside, have offices or own property in Virginia, all of which is specifically denied under oath by the Defendants. Rather, Plaintiff contends that there is personal jurisdiction over Defendants under Va. Code § 8.01-328.1(3)[10] based on the harm inflicted in Virginia and (1) the participation in the virtual meeting of NAME's Ethics Committee on March 17, 202 of Dr. Samantha Wetzler, a NAME member living in Virginia who is neither a defendant nor an alleged co-conspirator; and (2) soliciting Virginia members to sign letters criticizing the survey and the Article, one of which was signed by one Virginia member who is not a Defendant or alleged to be a co-conspirator. Alternatively, Plaintiffs claim personal jurisdiction over Defendants under Va. Code § 8.01-328.1(4)[11] based on its alleged harm in Virginia and a variety of activities within Virginia that allegedly constitutes a persistent and regular course of conduct.

In claiming specific jurisdiction based on Dr. Wetzler's participation in the Ethics Committee's virtual meeting, Plaintiffs rely on a "conspiracy theory of jurisdiction"[12] under Va. Code § 8.01-328.1(3) and the definition of an "act" under Va. Code § 8.01-328.1(B).[13]  In particular, Plaintiffs contend that Dr. Wetzler, while acting as an agent of NAME, used a

---

[10] Va. Code § 8.01-328.1(3) allows a court "to exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's . . . (3) causing tortious injury by an act or omission in this Commonwealth."
[11] Va. Code § 8.01-328.1(4) allows a court "to exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's . . . (4) causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth."   Plaintiffs allege that "Defendants caused tortious injury by acts or omissions inside and outside of this Commonwealth, regularly do or solicit business in the Commonwealth, regularly engage in courses of conduct in the Commonwealth, derive substantial revenue from goods used or consumed or services rendered in the Commonwealth, and use a computer or computer network located in the Commonwealth." Compl. ¶ 30.
[12] Plaintiffs allege that "defendants committed civil conspiracy under both the common law and Va. Code §§ 18.2–499 and 18.2–500. Co-conspirators are agents for each other. As such, the acts of any one co-conspirator are imputed to the others." Compl. ¶ 31.
[13] Virginia's long-arm statute provides that "[u]sing a computer or computer network located in the Commonwealth shall constitute an act in the Commonwealth."  Va. Code § 8.01-328.1(B).

11

computer in Virginia tied to a computer network in Virginia, and therefore committed on behalf of NAME an act that contributed to Plaintiffs' injuries in Virginia.

      Several difficulties attend this contention. First, there is no allegation in the Complaint or evidence in the motions papers concerning where or how Dr. Wetzler participated in the videoconference other than that she participated through a videoconferencing link supplied by one of the non-resident Defendants. Second, there is also no allegation in the Complaint that Dr. Wetzler acted as an agent of NAME when participating in the videoconference, that is, someone who acted at the direction and control of NAME or any other Defendant; and there is nothing in the motions papers with respect to Dr. Wetzler's association with NAME other than she was a member of NAME and in that capacity served on the Ethics Committee, neither of which the Court finds sufficient to reasonably infer that she acted as an agent acting at the direction or control NAME when serving on the Ethics Committee. *See Restatement (Third) of Agency* § 1.01 (2006) (stating that an agency relationship arises "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"); *see also Restatement (Second) Agency* § 14 cmt. a (1958) ("[T]he agent is subject to a duty not to act contrary to the principal's directions."); *id.* cmt. b. (noting that the principal "has power to give lawful directions which the agent is under a duty to obey . . . ."). Third, Dr. Wetzler is not named as a defendant or a co-conspirator; and there no basis in the motions papers for reasonably inferring that Dr. Wetzler conspired with the non-resident Defendants or acted as a co-conspirator in furtherance of the alleged conspiracy. *See Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (providing that personal jurisdiction based on a conspiracy must be

based on constitutionally sufficient contacts with the forum state through the actions of their alleged coconspirators). In fact, as Plaintiff has affirmed, Dr. Wetzler's role as an Ethics Committee member was to make a recommendation to the Executive Committee, *see* [Doc. No. 26-1] ¶ 32; and as one of seventeen members of the Ethics Committee, *see* [Doc. No. 26 -3], her vote was not required to advance consideration of the Ethics Complaint.  *See also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1031 (D.C. Cir. 1997) (requiring that "the plaintiff . . . plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy").  Fourth, even if Dr. Wetzler somehow could be deemed to be acting as an agent of NAME or any other Defendant (which she cannot, based on the motions papers), there is nothing about Dr. Wetzler's connecting to a videoconference link for a virtual meeting, even if from a Virginia computer,[14] that evidences any Defendant's directing electronic activity into Virginia, with the manifested intent to purposefully avail themselves of the laws of Virginia.  Likewise, with respect to NAME's alleged solicitation of Virginia members to sign a letter.  As evidenced by those who did sign, *see* [Doc. No. 26-19], NAME solicited its membership generally and there is no evidence that it specifically targeted Virginia members.  Finally, Plaintiffs have failed to satisfy the second prong of the constitutional analysis, that the plaintiffs' claims arose out of those activities directed at Virginia.  In that regard, Plaintiffs' reputational and other harms are alleged to have arisen as a result of various letters, publications and communications that occurred outside of Virginia, without any evidence that they were specifically targeted at Virginia, and none of Plaintiff's alleged injuries have a

---

[14] There is no information in the motion papers concerning where or how Dr. Wetzler connected into the video conferenced Ethics Committee meeting.

sufficient causal connection to Dr. Wetzler's participation in the virtual meeting on March 17, 2021.

Plaintiffs' alternative grounds for specific personal jurisdiction under Va. Code § 8.01-328.1(4) also fails to satisfy most clearly the second prong of the applicable constitutional Due Process test since, even if the relied upon in-state activities were sufficient to establish minimum contacts or a regular and persistent course of conduct, which is far from clear, none of the Plaintiffs' claimed injuries within Virginia have a sufficient causal connection with any of those activities, such that they could be deemed to have arisen from those activities. *See Perdue Foods LLC.*, 814 F.3d at 189 (4th Cir. 2016); *ALS Scan, Inc.*, 293 F.3d 707, 712-13 (4th Cir. 2002).[15]

For the above reasons, Plaintiffs have failed to establish a *prima facie* case of specific personal jurisdiction over any of the Defendants. Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss the Complaint [Doc. No. 7] and Defendant Peterson's Motion to Dismiss for Lack of Personal Jurisdiction [Doc. No 10] be, and the same hereby are, GRANTED based on a lack of personal jurisdiction over any Defendant;

---

[15] In *Bristol-Myers Squibb Co. v. Superior Court of California*, 147 S. Ct. 1773 (2017), the United States Supreme Court considered "our settled principles" of specific jurisdiction, albeit within the context of a non-resident Plaintiff who had alleged out of state harm. Nevertheless, the Supreme Court's pronouncements endorse the lack of specific personal jurisdiction in this case. In that regard, the Supreme Court confirmed that "the suit must arise out of or relate to the defendant's contacts with the forum'" *Id.* at 1780 (internal quotations, citations, and alterations omitted). For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* Although "the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice" must be considered, "the primary concern" is "the burden on the defendant." *Id.* For these reasons, "[i]n order for a court to exercise specific jurisdiction over a claim, there must be an "affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State." *Id.* at 1781 (internal quotations, citations, and alterations omitted). And "[w]hen there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities to the state." *Id.* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 931 (2011) ("[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over claim unrelated to those sales.")).

Defendants' Motion to Dismiss [Doc. No. 7] is otherwise DENIED as moot; and this action is DISMISSED without prejudice.[16]

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

November 9, 2021
Alexandria, Virginia

---

[16] Plaintiffs have requested that in the event that the Court grants the Motions to Dismiss for lack of personal jurisdiction, they be permitted to conduct jurisdictional discovery. The Court has reviewed their outstanding discovery request and the discovery they propose, should the Motions to Dismiss be granted, and finds nothing in what Plaintiffs have requested or proposed that would reasonably suggest such discovery would allow Plaintiffs to discover jurisdictional facts sufficient to establish a *prima facie* case of personal jurisdiction over these non-residents and that request is denied. *See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* 334 F.3d 390, 402-403 (4th Cir. 2003) (stating that, to warrant jurisdictional discovery, a plaintiff must demonstrate that, without engaging in a "fishing expedition," the requested discovery could affect the jurisdictional analysis).